**Lawrence E. TOLERSON, Plaintiff,**

v.

**AUBURN STEEL COMPANY, INC.; Sumitomo Corporation of America; SC Steel Investment, Inc.; and Yamato Kogyo (U.S.A.) Corporation; d/b/a Arkansas Steel Associates, an Association of Partners, Defendants.**

No. J–C–96–139.

United States District Court,
E.D. Arkansas,
Jonesboro Division.

Feb. 24, 1997.

Order Denying Reconsideration
March 18, 1997.

Larry J. Steele, Walnut Ridge, AR, for Plaintiff.

Phillip D. Hout, Thaxton, Hout & Howard, Newport, AR, for Defendants.

### *ORDER GRANTING MOTION FOR SUMMARY JUDGMENT*

EISELE, District Judge.

Before the Court is Defendants' Motion for Summary Judgment. Plaintiff has filed a response to that Motion, and the Court, having reviewed the submissions of the parties, has determined that Defendants' Motion should be granted for the reasons set forth in this Order.

# I

## *Background*

This case arises out of Arkansas Steel Associates' (hereinafter "ASA's") alleged race discrimination against Plaintiff Lawrence E. Tolerson (hereinafter "Plaintiff"), a black individual. ASA is a partnership composed of Defendants Auburn Steel Company, Inc.; Sumitomo Corporation of America; SC Steel Investment, Inc.; and Yamato Kogyo (U.S.A.) Corporation (hereinafter "Defendants" or "ASA"). Through ASA, Defendants manufacture steel products in Newport, Arkansas. ASA employed Plaintiff from the fall of 1989,[1] soon after Defendants purchased Razorback Steel, until May 5, 1995, when ASA fired Plaintiff.

Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission (hereinafter the "EEOC") on October 25, 1995. Plaintiff alleged that ASA had discriminated against him on the basis of his race in violation of Title VII of the Civil Rights Act of 1964. Specifically, Plaintiff pointed to ASA's discharging him for sleeping on the job and to ASA's scheduling him in conflict with his outside business. On March 27, 1996, the EEOC mailed to Plaintiff a document indicating that his Charge had been dismissed and providing him notice of his right to sue in federal court.

Plaintiff filed the instant lawsuit on May 9, 1996, alleging that certain ASA actions constituted race discrimination against him in violation of Title VII of the Civil Rights Acts of 1964 and 1991. Plaintiff requests that he be reinstated to his position and awarded an unstated amount in compensatory damages for mental stress, back pay, attorney's fees, and punitive damages. Plaintiff alleges a variety of actions by ASA that he contends constitute race discrimination and entitle him to relief.

At ASA, Plaintiff worked on the "third shift," or "midnight shift," from 11 p.m. until 7 a.m. Plaintiff also owns and operates a funeral home as an outside business. Ricky Herring, an hourly employee of ASA, testified during his deposition that he believed that two ASA supervisors, whom Herring declined to name, were jealous of that outside business. According to Plaintiff, ASA scheduled him to work certain overtime hours when it had knowledge that Plaintiff had an obligation to conduct a funeral. Plaintiff submits that ASA scheduled him to work on seven of the thirty-five different weekends when he had funerals to conduct: May 12 and June 16, 1990; October 19, 1991; October 24 and November 21, 1992; February 13, 1993; and August 12, 1994. Plaintiff contends that Monroe King, a white employee of ASA, was given preferential treatment in scheduling because of King's outside farming operation. King's deposition testimony indicates that King was allowed to work several times on the third shift to enable him to attend to his other obligations.

ASA states that it regularly schedules its employees to work when ASA needs them, regardless of any employee's outside job. Plaintiff stated on his employment application that he would be willing to work on holidays and weekends. ASA specifically denies that it ever scheduled Plaintiff to work solely because it had knowledge that he had other obligations. Moreover, in contrast to King, Plaintiff was allowed to work the midnight shift at all times, enabling him, as a general rule, to attend to his funeral home.

Plaintiff asserts that, in November of 1989, he requested copies of the blueprints of ASA's electrical system to assist him in performing maintenance and that ASA refused "originally" to provide the requested blueprints. Plaintiff alleges that he suffered electrical burns to his eyes and hands in January of 1990. According to Plaintiff, after he suffered the electrical burns, ASA provided certain blueprints of their electrical system but refused to identify the location of certain equipment. Furthermore, Plaintiff contends that, before the bandages were removed from his hands, David Davis, then Plaintiff's supervisor, attempted to compel Plaintiff to scrape rust from scrap metal in

---

1. Plaintiff points to October of 1989, while Defendants submit that ASA hired Plaintiff "on or about November 14, 1989."

the open sun and in full view of ASA's other employees.

Defendants indicate that the blueprints were available to ASA's electricians in ASA's maintenance office and that this availability was well known to all of ASA's electricians. Defendants deny that Plaintiff sustained any work-related injury in January of 1990, but they point to three injuries sustained by Plaintiff during his work as an electrician at ASA. On December 2, 1989, according to Defendants, Plaintiff sustained an electrical burn to his hand while rewiring a circuit without turning off the power to the circuit. On March 9, 1990, Plaintiff sustained an electrical burn to his ear while working on equipment with which he was not familiar and without having first turned off the power to the equipment. Finally, on March 28, 1990, Plaintiff sustained an electrical burn to his hand while working on a crane hoist without having first turned off the power to the hoist.

Plaintiff indicates that ASA demoted him from electrician to maintenance mechanic in January of 1990. Defendants, however, submit that the move, made on March 29, 1990, was a lateral transfer, with no reduction in wages or benefits, that was brought on by Plaintiff's poor safety record as an electrician. After Plaintiff's job shift, Larry Lashlee, a white man, took the electrician's position. Lashlee admitted during his deposition that he had misplaced anger at Plaintiff for originally getting the electrician position.

Plaintiff complains that, in January of 1994, Jim Taylor, a supervisor at ASA, exposed Plaintiff to life-threatening danger by requiring him to perform vibration tests on three 500–ton presses while the motors were running. Plaintiff contends that performing such a test with the motor running was dangerous and contrary to accepted procedure. Plaintiff submits that no other employee of ASA has ever been required to run such a test and that, after running the tests for several months, Plaintiff refused to continue because of fear for his life.

Defendants contend, however, that there are only two accepted methods of testing such equipment for vibrations which are recognized in the industry, and both methods require the press motor to be running during the test. Thus, according to Defendants, testing a press for vibration with the press motor running is not dangerous or contrary to recommended procedures. Defendants assert, moreover, that ASA employees routinely test presses for unusual vibrations when necessary and that ASA has no knowledge of any employee ever having refused to run such a test.

Plaintiff submits that he sustained a work-related injury to his back while changing a wheel on a transfer cart. Defendants state that ASA's records indicate that Plaintiff strained his back on January 29, 1994, and was off work for three days with full pay as a result. According to Defendants, after the three days were up, Plaintiff returned to work with no noted problems, his treating physician having released him for full duty on February 3, 1994.

According to Plaintiff, on March 24, 1995, Plaintiff sustained a work-related sprain to his right wrist while changing a tilt cylinder on a mill. Although the injury required him to seek the care of a doctor, ASA "denied compensability." Plaintiff asserts that, on April 1, 1995, he requested a leave of absence from Taylor because the muscle relaxers and pain medication prescribed in relation to his injury caused drowsiness. According to Plaintiff, Taylor denied Plaintiff's request and required Plaintiff to continue working.

Defendants assert that ASA's records show that Plaintiff sprained his wrist on March 24, 1995, but that he missed no work as a result. Moreover, Defendants point out that Plaintiff was never certified by a treating physician as being unable to perform his full duties as a result of his sprained wrist and that Plaintiff never suffered a denial of compensation. Defendants contend, moreover, that Plaintiff never requested and was never denied a medical leave of absence. In any event, Plaintiff admits that he did not submit a doctor's report recommending light duty.

Plaintiff was awakened twice and verbally warned against sleeping on the job on April 25, 1994, apparently after nodding off in his work area. On April 28, 1994, Plaintiff was observed by Tommy Long, the shift foreman

in the rolling mill, sleeping in a loft above the maintenance room, using dirty laundry as a pillow. He was issued a Contact Report and told that the next incident of his being caught sleeping would subject him to discharge. Dan Haygood, ASA's human resource manager, testified in his deposition that Plaintiff's being on medication was the reason for his not being more severely reprimanded.

Plaintiff submits that he was allowed to work while on medication because work-related absences of employees have an adverse effect on ASA's insurance rates. On May 5, 1995, during his shift at ASA, Plaintiff returned to his automobile, which was located in ASA's parking lot, "to dose a few minutes because of the effect of the prescribed medication he was taking." Plaintiff asserts that he was "completely caught up on his work." Taylor came to the plant that night, and his statement indicates that, after he realized that Plaintiff was not in his work area, he searched for Plaintiff and found him asleep in his van. Defendants suspended Plaintiff following this fourth incident, and, on May 8, 1995, ASA fired Plaintiff for sleeping on the job. Plaintiff was the first employee of ASA to be fired for sleeping on the job.

Plaintiff submits that it was "common practice" for maintenance employees of ASA to sleep occasionally on the third shift, when they were caught up on their work, and he asserts that white employees have been caught sleeping on the job but not fired. Plaintiff names Herring, Jimmy Dale Riley, William Street, and David Davis as examples of such white employees. He asserts that Ricky Husky, another white employee, was allowed to sleep in Long's office. Plaintiff testified that maintenance department employees slept out in the open, and no one awoke or reprimanded them. Moreover, according to Plaintiff, a supervisor, Gunter Alderman, has walked in on sleeping employees and turned around and left the room. Plaintiff points to the affidavit of Teresa Steel, who states that, while she was employed by ASA as a crane operator from October 1989 until August 1, 1996, it was routine for people to sleep on the job on the third shift and that supervisors were aware of employees' sleeping but followed no procedure on making complaints about who slept on the job. Plaintiff also cites Marlin Brandon's affidavit, which suggests that Brandon was aware that people slept on the third shift. Ronnie Williams testified in deposition that supervisors had seen him sleeping on the job.

Defendants deny that it is common practice for any of their employees to sleep on the job. They submit that ASA's policy, as set forth in its Employee Handbook, is that all employees be mentally alert and physically capable of performing their work while on duty. ASA admits that both white and black employees have been found sleeping on the job and have been warned against such conduct without being discharged. However, no employee, other than Plaintiff, has ever been found sleeping on the job more than once. Specifically, Defendants note that Herring was found sleeping on the job on December 23, 1994. Herring fell asleep and failed to light a certain furnace in the plant, thereby causing substantial disruption, and was placed on probation for three months with a ten-percent pay cut. He was also issued a Contact Report. Moreover, on "relatively few occasions," Long has permitted employees who became overheated to enter his office to rest and cool off, and, on some occasions some of those employees may have slept briefly. According to Defendants, Davis has never been found sleeping on the job by ASA supervisory or management personnel.

Defendants do point to other instances, beyond those involving Plaintiff and Herring, when employees have been found sleeping on the job. Carl Ward, a black man, was found by David Bedwell, a general foreman in the melt shop, sleeping on duty on May 22, 1991. Ward was issued a Contact Report and received a ten-percent pay cut for three months. Sherman Balentine, a black man, was found by Taylor sleeping on duty in a crane cab in March of 1991. Balentine was awakened and given a verbal warning against sleeping on duty. Larry Pruitt, a black man, was found by Scotty Fisher, a supervisor, sleeping on duty on April 19, 1993. He was issued a Contact Report and warned against sleeping on duty. Riley, a white man, was once found by a supervisor in an office with

the lights turned off and the door locked. Because the circumstances suggested that Riley was sleeping, management verbally reprimanded him and warned him against sleeping on the job.

On December 31, 1996, Defendants filed the instant Motion for Summary Judgment, arguing that no genuine issue of material fact exists and that they are entitled to judgment as a matter of law.

## II

### *Standard for Summary Judgment*

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, the Court may grant summary judgment only when "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56, *quoted in Anderson v. Liberty Lobby*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). At this stage, the Court's function is not to attempt to divine the "true" facts of the case but to determine whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Liberty Lobby*, 477 U.S. at 249, 106 S.Ct. at 2511. In making this determination, the Court must view the evidence in the light most favorable to the nonmovant, affording that party the benefit of all reasonable inferences that can be drawn therefrom. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); *Reich v. Hoy Shoe Co., Inc.*, 32 F.3d 361, 364 (8th Cir.1994). If, under such a view of the evidence, it is clear that no more than a "metaphysical doubt" exists as to the material facts of the case and that the movant is entitled to judgment under such facts, summary judgment is appropriate. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986).

 A court, however, should seldom grant summary judgment in a case alleging employment discrimination. *See Johnson v. Minnesota Historical Society*, 931 F.2d 1239,

1244 (8th Cir.1991) (citing *Haglof v. Northwest Rehabilitation, Inc.*, 910 F.2d 492, 495 (8th Cir.1990)). The United States Court of Appeals for the Eighth Circuit has reasoned that, because discrimination is difficult to prove, cases which involve discrimination require more simplified proof from a plaintiff in order to create an inference of discrimination and thereby to establish a *prima facie* case. *See id.* (citing *Hillebrand v. M–Tron Indus., Inc.*, 827 F.2d 363, 364–65 (8th Cir.1987), *cert. denied*, 488 U.S. 1004, 109 S.Ct. 782, 102 L.Ed.2d 774 (1989)). Summary judgment, therefore, "should be sparingly used and then only in those rare instances where there is no dispute of fact and where there exists only one conclusion." *Id.* (citing *Hillebrand*, 827 F.2d at 364). The Court finds that this case presents one of those rare instances entitling the movant to summary judgment.

## III

### *Exhaustion*

 As an initial matter, Defendants submit that the Court should dismiss Plaintiff's claims based on alleged conduct that Plaintiff did not mention in his EEOC charge. Defendants cite *Williams v. Little Rock Municipal Water Works*, 21 F.3d 218 (8th Cir.1994), to the Court in support of their proposition. In *Williams*, the Eighth Circuit upheld the district court's summary judgment against the plaintiff on her race-discrimination claim because the plaintiff had alleged only retaliation and not race discrimination in her EEOC charge. *See id.* at 222–23. The court wrote as follows:

In the present case, Williams' claims of race discrimination are separate and distinct from her claims of retaliation. Not only did Williams fail to check the box for race discrimination, her 1990 EEOC charge and supporting affidavit specifically and unambiguously alleged that Water Works retaliated against her because she had filed a charge with the EEOC in January of 1987. The 1990 EEOC charge does not even hint of a claim of race discrimination. This amounts to more than a mere technicality and is the product of an unconstrained reading of Williams' charge. The

only claim properly addressed by EEOC administrative processes was that of retaliation. Therefore, we hold that the district court did not err in granting Water Works' motion for summary judgment as to Williams' Title VII race discrimination claims.

*Id.* at 223. Defendants argue that the instant case is analogous and that, therefore, the Court should grant summary judgment on Plaintiff's claims unrelated to the allegations in her EEOC charge.

In Plaintiff's charge, he alleged race discrimination and made two specific accusations: that Defendants discharged him for sleeping on the job but did not treat similarly situated white employees in a like manner and that Defendants scheduled him to work shifts that interfered with his outside employment but did not treat similarly situated white employees in a like manner. The complaint in the instant suit likewise alleges race discrimination but supplies a number of additional allegations of misconduct by Defendants. For example, Plaintiff submits that Defendants denied him access to requested blueprints of Defendants' electrical systems, that Plaintiff sustained various work-related injuries as a result, that Plaintiff was asked to scrape rust from metal while his hands were bandaged, that Plaintiff was demoted from his position as an electrician to a position as a maintenance mechanic, that Plaintiff was exposed to hazardous working conditions, and that Plaintiff was denied certain medical leaves of absence. It is clear that these allegations go beyond the allegations of Plaintiff's EEOC charge.

■ Although the complaint contains allegations beyond the allegations of the EEOC charge, "[a] plaintiff will be deemed to have exhausted administrative remedies as to allegations contained in a judicial complaint that are *like* or *reasonably related to the substance of the charges timely brought before the EEOC.*" *Id.* at 222 (emphasis added). Plaintiff did not respond to Defendants' argument, but there is a good-faith basis for rejecting their contention. The instant case is, at least at first blush, distinguishable from *Williams* in that, in *Williams,* the plaintiff alleged completely different causes of action in her EEOC charge and her complaint. In this case, however, both Plaintiff's EEOC charge and his complaint allege race discrimination. Thus, one might argue that the allegations are sufficiently "related" to withstand Defendants' argument.

The problem, though, is that the instant complaint alleges instances of race discrimination that are separate and distinct from the allegations of the EEOC charge and bear no real connection to those allegations. Plaintiff submits that the various allegations constitute a continuing pattern of discrimination against Plaintiff, in effect a conspiracy, apparently, either to drive him from his job or to bring about his termination. Plaintiff, however, provides no evidence to substantiate that claim. Herring's assertion that he believed that two supervisors were jealous of Plaintiff's outside business, even when viewed in the light most favorable to Plaintiff, does not constitute evidence of a concerted plan of action that would tie Plaintiff's disparate allegations together. Likewise, Lashlee's admission that he, an hourly employee of ASA, bore misplaced anger toward Plaintiff does not constitute evidence that ASA designed to discriminate against Plaintiff through this series of alleged acts. In short, there is no evidence of a plan to discriminate against Plaintiff on different occasions or of a pattern of racial discrimination. Indeed, in Plaintiff's pleadings, these allegations do not carry with them an allegation that they were based on Plaintiff's race.

Examining the rationale behind administrative remedies, the Court concludes that Defendants are entitled to summary judgment on Plaintiff's claims whose substance was not revealed in Plaintiff's EEOC charge. In *Williams,* the Eighth Circuit wrote as follows:

Exhaustion of administrative remedies is central to Title VII's statutory scheme because it provides the EEOC with the first opportunity to investigate discriminatory practices and enables it to perform its roles of obtaining voluntary compliance and promoting conciliatory efforts. *Patterson v. McLean Credit Union,* 491 U.S. 164, 180–81, 109 S.Ct. 2363, 2374–75, 105 L.Ed.2d 132 (1989). To exhaust adminis-

trative remedies an individual must: (1) timely file a charge of discrimination with the EEOC *setting forth the facts and nature of the charge* and (2) receive notice of the right to sue. 42 U.S.C. § 2000e–5(b), (c), (e).

*Williams,* 21 F.3d at 222 (emphasis added). Although recognizing that the facts of this case are not precisely analogous to the facts of *Williams,* the Court concludes that its allowing the allegations that go beyond the EEOC charge to go to trial would frustrate the goals of the doctrine of exhaustion of remedies. The additional allegations constitute separate and distinct causes of action under Title VII, and, therefore, the additional allegations are not reasonably related to the allegations brought before the EEOC. Defendants' Motion for Summary. Judgment, therefore, will be granted as to all claims unrelated to Defendant's termination of Plaintiff's employment and their scheduling of his work hours on the ground that Plaintiff failed to exhaust his administrative remedies.

## IV

### *The Remaining Claims*

The Court must evaluate claims arising under Title VII according to the framework set out in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Ruby v. Springfield R–12 Public School District,* 76 F.3d 909, 911 (8th Cir.1996); *McLaughlin v. Esselte Pendaflex Corp.,* 50 F.3d 507, 510 (8th Cir.1995). Under Title VII, when an employee "produces direct evidence that an illegitimate criterion such as [race] 'played a motivating part in [the] employment decision,' ... the burden-shifting standards of *Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) come into play." *Beshears v. Asbill,* 930 F.2d 1348, 1353 (8th Cir.1991) (quoting *Price Waterhouse,* 490 U.S. at 258, 109 S.Ct. at 1794–95); *Radabaugh v. Zip Feed Mills, Inc.,* 997 F.2d 444, 448 (8th Cir.1993). If Plaintiff can meet this burden at trial, Defendants will avoid liability only by showing by a preponderance of the evidence that they would have made the same employment decisions even if they had not considered the illegitimate criterion. *See*

*Radabaugh,* 997 F.2d at 448; *Beshears,* 930 F.2d at 1353. To satisfy the *Price Waterhouse* inquiry, Plaintiff must do more than merely establish a *prima facie* case of discrimination and must present " 'evidence of conduct or statements by persons involved in the decision-making process that may be viewed as directly reflecting the alleged discriminatory attitude ... sufficient to permit the factfinder to infer that that attitude was more likely than not a motivating factor in the employment decision.' " *Radabaugh,* 997 F.2d at 449 (quoting *Ostrowski v. Atlantic Mut. Ins. Cos.,* 968 F.2d 171, 182 (2d Cir. 1992)). Plaintiff provides no direct evidence that his alleged treatment was based on his race.

Under *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d·668 (1973), a plaintiff, in the absence of direct evidence, must make out a *prima facie* case of discrimination to proceed. To establish a *prima facie* case for a violation of Title VII, Plaintiff must show the following: "(1) plaintiff is a member of a protected class; (2) plaintiff met applicable job qualifications; and (3) despite qualifications, plaintiff was displaced. In addition, the plaintiff must also demonstrate that the adverse employment decision ·occurred in ' "circumstances which allow the court to infer unlawful discrimination." ' " *McLaughlin,* 50 F.3d at 510–11 (quoting *Davenport v. Riverview Gardens School,* 30 F.3d 940, 944 (8th Cir. 1994) and *Craik v. Minnesota State Univ. Board,* 731 F.2d 465, 469 (8th Cir.1984)). Defendants concede for the purposes of their Motion that Plaintiff can establish a *prima facie* case of race discrimination in violation of Title VII.

Once the plaintiff has set forth a *prima facie* case, the defendants must come forward with a legitimate, nondiscriminatory reason for the employment decision, and then the plaintiff retains the ultimate burden of showing that the proffered legitimate reason was mere pretext and that actual discrimination existed. *See Ruby,* 76 F.3d at 911; *McLaughlin,* 50 F.3d at 510; *Radabaugh,* 997 F.2d at 448. Defendants submit that Plaintiff has no evidence that their proffered legitimate, nondiscriminatory reasons for ter-

minating his employment and scheduling him as they did were pretextual. The Court agrees.

## A. Alleged Discriminatory Scheduling

■ Plaintiff has provided no evidence that he was discriminated against in his scheduling. It is undisputed that Plaintiff stated on his employment application that he was willing to work weekends and holidays and that Plaintiff chose—and that ASA allowed him—to work the third shift in order to run his outside business. It is also undisputed that ASA called Plaintiff to work in conflict with his outside business on only seven out of thirty-five possible occasions in nearly five years, and there is no evidence that ASA knew of the conflict when it scheduled Plaintiff to work. Plaintiff points to Monroe King's testimony that he, a white individual, was accommodated when he had outside business conflicts as evidence that Plaintiff was scheduled in a discriminatory manner. It is undisputed, though, that King's work hours were merely redistributed to allow him to work on the third shift so that he could perform certain farming operations. It is undisputed that Plaintiff regularly worked on the third shift to allow him to pursue his outside business during the day. Based upon these undisputed facts, the Court concludes, as a matter of law, that Plaintiff has failed to provide sufficient evidence to permit a jury to find that ASA's reason for scheduling Plaintiff on the seven complained-of dates was a pretext for discrimination.

## B. Alleged Discriminatory Discharge

■ Plaintiff argues that ASA discriminated against him by firing him for sleeping on the job when sleeping on the job is a normal, accepted, and allowed part of working the third shift, and he suggests that the evidence shows that ASA's discharging him for sleeping was a pretext for race discrimination. The Court concludes, however, that Plaintiff's evidence fails to suggest that the reason proffered for his discharge was pretextual and, therefore, will grant the remainder of Defendants' Motion.

It is undisputed that numerous—if not all—ASA employees on the third shift have slept or dozed on the job. Indeed, Davis testified during his deposition that he had seen nearly every employee with his eyes closed at one time or another and that he himself had dozed at the table. Lashlee has been caught sleeping by other employees since Plaintiff was discharged. Williams testified that he had slept on the job at ASA and that he has had a supervisor come by and wake him up before. Plaintiff points, particularly, to the incident involving Herring's sleeping at work. As the Court noted above, Herring fell sound asleep on the job and failed to light a furnace. Regarding that incident, Davis testified that he did not understand how anyone could fail to light the furnace without the crew knowing about it. It is undisputed that Herring was issued a Contact Report and that he was placed on probation with a ten-percent dock in pay for three months. Herring testified in his deposition that he had slept on the job since being reprimanded for sleeping but that he had not been caught. Finally, Plaintiff notes that, of the five individuals who have been reprimanded for sleeping on the job but not fired, three are black and two are white.

Even viewed in the light most favorable to Plaintiff, these undisputed facts do not show pretext for discrimination. Plaintiff was simply not similarly situated to the other employees such that ASA's disciplinary action with regard to their sleeping on the job should have been identical. The Court must see evidence that ASA fired Plaintiff not because he was caught four times sleeping on the job away from his work station but because of his race. It is undisputed that employees, both black and white, doze on the job. It is also undisputed that both black and white employees have been reprimanded for sleeping. It is undisputed that no employee other than Plaintiff had been reprimanded for sleeping on the job more than once and warned that such behavior in the future would result in termination, and it is undisputed that no employee other than Plaintiff had been caught having left his work station to sleep. Plaintiff was not treated differently than other employees who stood in similar shoes. Plaintiff, having been reprimanded for sleeping four times and having

left his work area twice to sleep, cannot benefit from comparing himself to employees who committed less egregious actions.

Finally, Plaintiff seems to suggest that he was the target of an effort by ASA employees to catch him sleeping. Herring testified that, if management wanted to catch people sleeping on the third shift, they could do so by coming around unannounced. Lashlee indicated that it would be simple to catch someone sleeping if a supervisor were "gunning" for that employee. Williams testified that he worked on a casting tower in plain view but that he had never been written up by a supervisor for sleeping. It is undisputed that supervisors do not regularly appear at the plant during the third shift and that they normally receive calls from employees only when a problem arises. One employee testified that he would like to know how it happened that a supervisor appeared at the plant the night that Plaintiff was caught sleeping for the fourth time.

Although there is some evidence that ASA might have allowed certain employees to nod off at work, there is no evidence that ASA singled out in Plaintiff an employee who had committed no worse action than other employees and fired him because he was black. The Eighth Circuit has established that the Court must afford employers a considerable amount of discretion in running their businesses:

> Although Title VII tolerates no discrimination whether subtle or otherwise, this circuit has also acknowledged that employers have wide latitude to make business decisions. "[A]n employer has the right to ... assign work, to change an employee's duties, to refuse to assign a particular job, and to discharge—for good reason, bad reason, or no reason at all, absent intentional ... discrimination." *Walker v. AT & T Technologies, d/b/a AT & T Consumer Prod., d/b/a AT & T Phone Ctr., Inc.,* 995 F.2d 846, 849–50 (8th Cir.1993); *Neufeld v. Searle Laboratories,* 884 F.2d 335, 340 (8th Cir.1989) (recognizing that "courts have no business telling [companies] how to make personnel decisions, which may be subjectively or objectively based"); *Smith v.*

*Monsanto Chem. Co.,* 770 F.2d 719, 723 n. 3 (8th Cir.1985) (recognizing that an employer may develop arbitrary, ridiculous and even irrational policies as long as they are applied in a nondiscriminatory manner), *cert. denied,* 475 U.S. 1050, 106 S.Ct. 1273, 89 L.Ed.2d 581 (1986). Furthermore, the Supreme Court has stated that "the fact that a court may think that the employer misjudged the qualifications of the applicants does not in itself expose [the employer] to Title VII liability ...." *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 259, 101 S.Ct. 1089, 1097, 67 L.Ed.2d 207 (1981). It is not sufficient for McLaughlin to raise an issue regarding whether it was a wise decision to transfer her. She meets her burden only if she can present evidence that would allow a reasonable jury to conclude that the decision was based on her gender.

*McLaughlin,* 50 F.3d at 512. Thus, even if the Court concluded that ASA's policy was arbitrary and irrational, the Court would be unable to deny Defendants' Motion without some evidence that ASA's acts were motivated by a discriminatory animus. Plaintiff has failed to provide evidence that would allow a reasonable jury to conclude that his discharge was based on race, and, therefore, Defendants are entitled to summary judgment.

### V

#### *Conclusion*

IT IS THEREFORE ORDERED that Defendants' Motion for Summary Judgment[2] be, and it is hereby, GRANTED.

### *ORDER DENYING MOTION TO RECONSIDER*

Before the Court is Plaintiff Lawrence E. Tolerson's Motion to Reconsider Order Granting Motion for Summary Judgment and Brief. Defendants have responded, and the Court has reviewed the submissions of the parties. For the reasons set forth in this Order, the Court will deny Plaintiff's Motion.

**2.** Docket No. 9

## I.

### Background

On May 9, 1996, Plaintiff filed the instant lawsuit, alleging that Defendants, through their agents at Arkansas Steel Associates (hereinafter "ASA"), discriminated against him on the basis of his race in violation of Title VII of the Civil Rights Acts of 1964 and 1991. Specifically, Plaintiff pointed to the termination of his employment, the manner in which he was scheduled to work certain weekends, and certain tasks that ASA allegedly required him to perform as constituting race discrimination.

On February 21, 1997, the Court granted Defendants' Motion for Summary Judgment. In its February 21 Order, the Court held that Plaintiff's failure to exhaust his administrative remedies barred relief on most of the allegations he had pressed. When Plaintiff filed his charge with the Equal Employment Opportunity Commission on October 25, 1995, he complained only of his discharge and the manner in which he had been scheduled. The Court carefully examined Plaintiff's EEOC charge and his complaint in the instant suit and discussed those documents in the context of *Williams v. Little Rock Municipal Water Works,* 21 F.3d 218 (8th Cir. 1994). In *Williams,* the United States Court of Appeals for the Eighth Circuit upheld a district court's summary judgment against a plaintiff on her race-discrimination claim because the plaintiff had alleged only retaliation and not race discrimination in her EEOC charge. *See id.* at 222–23. The Court concluded that not only did the allegations in Plaintiff's complaint go beyond the allegations in his EEOC charge but also that they were not sufficiently like or related to warrant the Court's deeming Plaintiff to have exhausted his administrative remedies with respect to the additional allegations.

The Court went on to grant Defendants' Motion with respect to Plaintiff's claims that ASA discharged Plaintiff because of his race and that ASA scheduled Plaintiff to work certain weekends because of his race. The Court evaluated those claims according to the framework established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). The

Court determined that Plaintiff had set forth a *prima facie* case on both claims but that Defendants had stated legitimate, nondiscriminatory reasons for those actions. The Court discerned no genuine issues of material fact and held that Plaintiff had failed to offer any evidence showing that Defendants' proffered reasons were pretext for race discrimination. Thus, the Court granted Defendants' Motion for Summary Judgment on the "remaining claims."

In particular, with respect to ASA's alleged discriminatory scheduling of Plaintiff to work certain weekends in conflict with his outside funeral-home operation, the Court noted various undisputed facts. First of all, Plaintiff stated on his employment application that he was willing to work weekends and holidays, and Plaintiff chose to work the "third shift" to run his outside business. It was also undisputed that ASA called Plaintiff to work in conflict with his outside business on seven out of thirty-five possible occasions in nearly five years. Plaintiff indicated that Monroe King, a white employee, was scheduled to work in a certain manner on a few occasions to accommodate his outside farming operation. It was undisputed, however, that Plaintiff worked on the very shift on which ASA scheduled Mr. King to work to accommodate his schedule, and there was no evidence that ASA treated Plaintiff any differently.

The Court also held that Plaintiff had offered no evidence to suggest that Defendants' firing him for sleeping on the job was a pretext for race discrimination. It was undisputed that nearly all of ASA's employees on the third shift had slept or dozed on the job. It was undisputed that Ricky Herring had fallen asleep on the job and failed to light a furnace. He was issued a Contact Report and placed on probation with a ten-percent dock in pay for three months. It was undisputed that Plaintiff had been caught four times sleeping on the job. It was undisputed that both black and white employees had been caught sleeping on the job and that Plaintiff was the only individual who had ever been fired for sleeping on the job. It was undisputed that no other employee had been caught having left his work

station to sleep and that Plaintiff had left his work station two times to do so. The Court held that Plaintiff was not similarly situated to other employees such that ASA's disciplinary action with regard to their sleeping on the job should have been identical.

Finally, Plaintiff suggested that he was the target of an effort by ASA employees to catch him sleeping on the job. Certain hourly employees of ASA testified in deposition that it would be easy to catch someone sleeping on the job and that supervisors do not normally show up during the third shift unless they are called. The Court concluded that, even if ASA's policy were irrational, no evidence suggested that Plaintiff was the victim of discrimination because of his race.

On February 28, 1997, Plaintiff filed the pending Motion to Reconsider, asking the Court to vacate its February 21 Order. With regard to the claims dismissed by the Court on the ground that Plaintiff had not exhausted his administrative remedies, Plaintiff makes two points. First, Plaintiff contends that the Court should have allowed any evidence surrounding the unexhausted claims to go to a jury, regardless of whether Plaintiff could receive money damages, in order to show a discriminatory background. Second, Plaintiff contends that the Court made a factual determination inappropriate to the summary-judgment context when it concluded that Ricky Herring's assertion that two supervisors were jealous of Plaintiff's outside business did not constitute evidence of a concerted plan of action that would tie Plaintiff's disparate allegations together.

Regarding the remaining claims, Plaintiff argues that the Court improperly weighed the evidence and usurped the role of the jury. Plaintiff notes the following facts that, he suggests, the Court should have permitted a jury to consider: Mr. Herring's statement that supervisors were envious of Plaintiff's outside business, Larry Lashlee's admission that he had misplaced anger toward Plaintiff because Plaintiff won a position as an electrician, Defendants' admission that Plaintiff was the only employee ever fired for sleeping on the job and that his sleeping never disrupted

plant activities, Defendants' admission that having Plaintiff present rather than absent aided insurance costs, Plaintiff's contention that he asked for a medical leave but that it was denied, and the alleged difference in treatment among various employees caught sleeping at work. Plaintiff also submits certain additional evidence, including performance evaluations, a memorandum from Gunter Altermann to Plaintiff, and an absence payment request signed by Plaintiff.

Defendants filed their reply on March 4, urging the Court to deny Plaintiff's Motion to Reconsider.

## II

### The Law

 Plaintiff filed his self-styled Motion to Reconsider within ten days, exclusive of intervening weekends and holidays, of the entry of the Court's February 21 Order. The Court, therefore, construes Plaintiff's Motion as a motion to alter or amend judgment pursuant to Rule 59(e) of the Federal Rules of Civil Procedure. *See Trout v. Trout,* 984 F.2d 977, 978 (8th Cir.1993).[1] A motion to alter or amend judgment serves "to correct manifest errors of law or fact or to present newly discovered evidence." *DeWit v. Firstar Corp.,* 904 F.Supp. 1476, 1495 (N.D.Iowa 1995) (internal quotation and citations omitted). Thus, to prevail on his Motion, Plaintiff must clearly establish a manifest error of law or fact or present newly discovered evidence. *See id.* A plaintiff may not use such a motion to introduce evidence that was available during the pendency of the dispositive motion nor to present arguments that could or should have been raised earlier. *See id.* The Court will grant a motion to alter or amend judgment only in extraordinary circumstances. *See id.*

## III

### Discussion

The Court will deny Plaintiff's Motion. With respect to Plaintiff's unexhausted claims. Plaintiff first argues that the Court

---

**1.** The Federal Rules of Civil Procedure do not provide for a motion for reconsideration. *See* *Trout,* 984 F.2d at 978 (quoting *Sanders v. Clemco Industries,* 862 F.2d 161, 170 (8th Cir.1988)).

should have sent any evidence surrounding those claims to the jury as background for the claims that Plaintiff did exhaust. In granting summary judgment on those claims, the Court did not make an evidentiary ruling, and nowhere in its February 21 Order did the Court indicate that, if the exhausted claims proceeded to trial, the Court was inclined to admit or exclude any of the evidence connected to the unexhausted claims. The Motion for Summary Judgment did not present an appropriate context for the Court to make an evidentiary ruling. Rather, the Court concluded that Plaintiff could not prevail on his unexhausted claims.

■ Second, Plaintiff suggests that the Court improperly weighed certain testimony that supervisors were jealous of Plaintiff's outside business. According to Plaintiff, a jury should have been allowed to consider Mr. Herring's assertion that certain supervisors were jealous of Plaintiff's outside business in order to determine whether a concerted plan of action existed to link Plaintiff's disparate allegations. The Court disagrees. Plaintiff alleges that he was the victim of *racial* discrimination. To tie disparate allegations race of together, Plaintiff would have to show evidence of some pattern of activity *based on race.* Plaintiff himself alleges that certain supervisors were jealous of Plaintiff because of his outside business. How a supervisor's jealousy of Plaintiff's funeral home operation translates into evidence of race discrimination is utterly lost on the Court.

Similar reasoning applies to Plaintiff's argument regarding his "remaining claims." When the Court considered those claims, it concluded that Plaintiff had established a *prima facie* case of discrimination but that he had failed to show any evidence of pretext for race discrimination. The Court will consider none of the new evidence submitted by Plaintiff because it is not, as a matter of law, "newly discovered." However, the Court will attempt to deal with each other piece of evidence noted in Plaintiff's Motion.

■ First of all, Mr. Lashlee's statement that he harbored misplaced anger toward Plaintiff because Plaintiff won a position as an electrician simply is not evidence that ASA fired Plaintiff or scheduled him in a particular manner because of his race. Not only does Mr. Lashlee not occupy a management or supervisory position with ASA, but neither does his admission touch at all upon Plaintiff's race.

With regard to the alleged disparate treatment among employees who have been caught sleeping on the job, the Court notes that it is undisputed that no one in the history of ASA has a history of sleeping on the job that parallels Plaintiff's history. It is undisputed that Plaintiff was reprimanded four times for falling asleep at work. On the first two occasions, he had apparently dozed off at his work station and was awakened and admonished. On the third occasion, he left his work station and went to the laundry loft to sleep, using a pile of dirty laundry as a pillow. He received a Contact Report, or written warning. On the fourth occasion, Plaintiff went to sleep in the back of his van in ASA's parking lot. That time, he was suspended and eventually terminated. Plaintiff points to the incident involving Ricky Herring as evidence that Defendants' firing him for sleeping on the job was a pretext for race discrimination. It is undisputed that Mr. Herring fell asleep at work and failed to light a furnace, disrupting plant operations. It is also undisputed that Mr. Herring was issued a Contact Report and was put on probation with a ten-percent dock in pay for three weeks. The Court simply cannot conclude that this set of facts offers any evidence of race discrimination. As the Court noted in its February 21 Order, employers have wide latitude in running their businesses. Plaintiff was fired after he received a Contact Report and nevertheless went to sleep on the job again. Mr. Herring received a Contact Report for sleeping on the job and disrupting plant operations one time. The Court cannot conclude that this evidence would permit a factfinder to infer a discriminatory animus.

■ The Court acknowledges that whether Plaintiff asked for and was denied a medical leave prior to his being caught sleeping for the fourth time is in dispute. It is the opinion of the Court that this is not an issue of *material* fact. Assuming that Defendants

conceded that Plaintiff requested and was denied a medical leave, the Court would nevertheless grant summary judgment in that such a fact would not change the failure of Plaintiff's evidence to suggest that Defendant was fired not because he slept on the job away from his work station after having been caught a number of times but because he was black.

The Court has struggled with the issues presented in this case and has concluded that its original disposition was and is correct. Title VII is designed to prevent and to remedy discrimination based on race, not discrimination of any type at all. Questions such as whether a supervisor disliked Plaintiff because of Plaintiff's outside business and whether ASA was wise or fair in discharging Plaintiff are not governed by Title VII, absent some indication that those questions implicate the issue of race. The fact that Plaintiff is black is not enough, in the eyes of this Court, to make such an implication. If Plaintiff could show that ASA treated him differently than similarly situated white employees or that black employees on the whole were treated differently than white employees, the Court's ruling would probably be different. However, the Court discerns no evidence in the record to suggest that race discrimination occurred in the instant case.

## IV

### *Conclusion*

IT IS THEREFORE ORDERED that Plaintiff's Motion to Reconsider Order Granting Motion for Summary Judgment[2] be, and it is hereby, DENIED.